MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
(Designated as counsel for service)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2186 / Fax: (415) 217-2040

ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 531-0841 / Fax: (206) 343-1526

*Counsel for Plaintiffs*

(List of counsel continued following caption)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, THE WILDERNESS SOCIETY, FRIENDS OF THE EARTH, SIERRA CLUB, and CENTRAL CALIFORNIA ASTHMA COLLABORATIVE, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT; DOUGLAS BURGUM, in his capacity as Secretary of the U.S. Department of the Interior; JOSEPH STOUT, in his capacity as California State Director of the U.S. Bureau of Land Management; U.S. BUREAU OF LAND MANAGEMENT FIELD MANAGER; JOHN HODGE, in his capacity as the Assistant Field Manager of Minerals of the U.S. Bureau of Land Management; HOLMES WESTERN OIL CORPORATION; and CHEVRON U.S.A. INCORPORATED dba CHEVRON USA INCORPORATED, <br><br> Defendants. | Civ. No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    1

1    ANDRIA H. SO (CA Bar No. 341595)
     aso@earthjustice.org
2    Earthjustice
     707 Wilshire Boulevard, Suite 4300
3    Los Angeles, CA 90017
     Tel: (415) 217-2000 / Fax: (415) 217-2040
4
     *Counsel for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      This case challenges the U.S. Bureau of Land Management's ("BLM's") decision to continue approving drilling permits for new oil and gas wells on public land in the San Joaquin Valley, California, without accounting for the cumulative impacts of BLM's expansion of oil and gas drilling, and without providing for meaningful input from the communities most impacted by its permitting decisions.

2.      BLM's unlawful permit approvals violate its mandates under the Clean Air Act ("CAA"), the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Mineral Leasing Act ("MLA"). Plaintiffs bring suit under these statutes to stop further harm to San Joaquin Valley communities and the environment.

3.      The San Joaquin Valley is the most polluted air basin in the country, and oil and gas extraction is a major contributor to this pollution. The dirty air has led to devastating health impacts to Valley communities, where residents currently experience the most asthma-related emergency room visits, heart attacks, and low birth-weight infants in the State of California.

4.      Under NEPA and the CAA, BLM is obligated to account for this pollution before it can approve any more drilling. Yet for decades, the agency has made the Valley's problems worse by continuously permitting new wells on the public lands it manages within the airshed without complying with these laws.

5.      Under the CAA, BLM must calculate the total direct and indirect emissions of the project it is approving to determine whether emissions are over the region's pollution thresholds for a "major source" of air pollution. If the major source threshold requirement is met, the agency must prepare a full CAA review and mitigate the project's emissions so that the project does not impair a region's ability to implement its plan for improving air quality. In performing this calculation, the project must not be "piecemealed" or segmented to create several smaller projects with the emissions from each compared to the *de minimis* levels.

6.      NEPA requires BLM to take a "hard look" at the environmental impacts of drilling activity. Courts have repeatedly held that to comply with this hard look mandate, BLM must analyze the cumulative air, water, and climate pollution impacts of the drilling it authorizes. The

agency should have analyzed these impacts when it prepared its Resource Management Plan ("RMP") for the region, but ultimately failed to do so. BLM is currently back at the drawing board to complete an adequate cumulative impacts analysis for its RMP, after settling a lawsuit with several of the Plaintiffs here challenging its failure to do so.

7. In light of this vacuum of adequate cumulative impacts analysis, Plaintiffs have implored BLM to address these deficiencies before granting further drilling permits. Plaintiffs also urged BLM to comply with public participation requirements under NEPA, FLPMA, and the MLA that require BLM to provide advance notice and opportunity for the public to comment before issuing more drilling permits.

8. The agency has nonetheless barreled ahead and unlawfully issued permits to oil companies in the San Joaquin Valley without the benefit of public notice and comment, including issuing ten permits that Plaintiffs challenged in *Center for Biological Diversity, et al. v. U.S. Bureau of Land Management, et al.*, No. CV-00938-JLT-CDB (E.D. Cal., filed June 22, 2023).

9. In December 2024, without waiting for this court to resolve the current ongoing challenge to BLM's flawed review of drilling permits, and with no public comment opportunity, the agency approved an additional twenty-five permits for Holmes Western Oil Corporation to drill new oil wells in the Valley ("Holmes wells"). A month later, in January 2025, the agency perfunctorily approved four more permits for Chevron U.S.A. Incorporated to drill new oil wells in the same area ("Chevron wells").

10. BLM unlawfully concludes that smog-creating pollution from these wells is insignificant by failing to analyze the Holmes and Chevron wells cumulatively with each other, with the many nearby wells already in place and under the same ownership, with the previous approvals challenged in Plaintiffs' ongoing lawsuit, or with the hundreds of drilling permits the agency plans to issue in the Valley in the coming years.

11. Indeed, despite approving the twenty-five Holmes wells on the same day to the same operator in the same oil field, BLM's environmental review unlawfully segments the permits into three smaller environmental assessments of ten, eleven, and four wells that each fail to reference or acknowledge each other, or account for the total pollution emissions from all the

wells. By piecemealing the project in this way, BLM unlawfully determined the pollution impacts were below CAA permitting thresholds. All the new Holmes wells will also be drilled in close proximity to residents' homes in the local community of Maricopa, in direct contravention of California's law establishing a 3,200-foot setback from residential areas to protect public health. BLM entirely failed to recognize that its approval of these wells violates state law.

12.     BLM's repeated, piecemeal permit approvals without due regard for cumulative impacts represent a death by a thousand cuts that federal law is meant to prevent. Left unchecked, the agency will continue to hide its decision-making from public scrutiny and obscure the larger impacts of its approvals by only considering each permit package in a vacuum, robbed of its full significance in the Valley. Plaintiffs therefore file suit in this Court challenging these latest approvals to bring judicial scrutiny to bear on BLM's unlawful expansion of oil and gas drilling in this already overburdened airshed.

**JURISDICTION AND VENUE**

13.     This action arises under the CAA, 42 U.S.C. § 7401 *et seq*., NEPA, 42 U.S.C. § 4321 *et seq*., FLPMA, 43 U.S.C. § 1701 *et seq*., the MLA, 30 U.S.C. § 181 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

14.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

15.     Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e)(1) because officers of the United States are named defendants in their official capacities, and a substantial part of the federal land that is the subject of this action lies in this district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the decision to issue the drilling permits occurred in BLM offices in this district.

16.     Assignment to the Fresno Division of this district court is proper because this case challenges permits located in Kern County, which is covered by the Fresno Division. L.R. 120(d).

1

**PARTIES**

2

Center for Biological Diversity

3          17.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit

4    environmental organization with offices and staff throughout the U.S., including in Oakland and

5    Los Angeles, California. The Center works through science, law, and policy to advocate for

6    increased protections for California species and their habitats, a livable climate, and healthy

7    communities by engaging at every step of federal fossil fuel planning, leasing, and development.

8    The Center has more than 79,000 members nationwide, with more than 17,000 members who

9    reside in California and more than 100 members in Kern County, including near Taft, California

10   in the area of the drilling permits at issue. Throughout the U.S. and the world, the Center has

11   more than 1.37 million supporters. The Center's members and staff use public lands and natural

12   resources in BLM's Bakersfield Field Office region covering Kern County and have longstanding

13   recreational, scientific, professional, and aesthetic interests in ensuring their continued use and

14   enjoyment of these lands. The Center brings this action on its own behalf and on behalf of its

15   adversely affected members.

16          18.     The Center's mission is to ensure the preservation, protection, and restoration of

17   biodiversity, native species, ecosystems, public lands and water, and public health. The Center

18   seeks to hold the federal government accountable for enforcing NEPA and the CAA with respect

19   to imperiled wildlife and habitat, air and water quality, and human health, especially on the

20   nation's public lands. Its efforts include a longstanding California Oil and Gas campaign

21   advocating for the protection of California species and natural resources against environmental

22   damage from oil and gas drilling and government oversight of oil and gas activities. The Center

23   also prepares and distributes a wide array of educational and informational materials concerning

24   threats to biodiversity and air and water quality, including public lands and natural resources in

25   BLM's Bakersfield Field Office region.

26          19.     To fulfill its mission, one of the Center's core business activities is engaging in

27   BLM land use planning and project proposals, and it has spent nearly a decade challenging

28   BLM's oil and gas management decisions in the Bakersfield Field Office region.

20.     The Center has individual members who live, visit, study, work, or recreate on the public lands and natural resources in the Bakersfield Field Office region in Kern County. These members have specific intentions to continue to interact with these areas frequently and on an ongoing basis. The additional oil and gas drilling authorized by the permits will also worsen the already poor air quality and other environmental and public health problems in this region, and harm the Center's interests in ensuring the continued use and enjoyment of the area for its members and staff.

21.     For example, the Center has individual staff and members who frequently use the federal lands and natural resources in the Bakersfield Field Office region in Kern County for activities such as hiking and walking in the area, searching for rare plants, watching birds and other wildlife, and enjoying the solace that wildlands can provide. They enjoy visiting these areas due to the wide diversity of ecological resources, and work to conserve San Joaquin Valley plant and wildlife species that are negatively impacted by oil and gas development. Some members also participate in air monitoring projects impacting the San Joaquin Valley, challenge oil and gas drilling proposals in the area, and educate local residents about air quality issues and leaks associated with oil and gas activity. The Center's members plan to regularly visit in the future.

22.     The Center's staff and members are worried about the health impacts of oil and gas production in Kern County because air pollutants associated with oil and gas development are known to increase respiratory problems including asthma and other health problems. They have experienced the region's poor air quality, which is due to air pollutants from activities like oil and gas drilling and agriculture that are blown south down the San Joaquin Valley and that get trapped in the Valley due to the surrounding mountains. The air quality is getting worse as more oil and gas development occurs, including the development permitted by BLM in the drilling permits challenged in this case. The Center has individual members who experience health effects such as regular nose bleeds and aggravation of their asthma because of the air pollution in the San Joaquin Valley. Some of the Center's members cannot drink the local water due to industrial pollution and instead must purchase their drinking and cooking water. Enjoyment of the region's public lands by the Center's staff and members is harmed by poor air quality and disruptions to

the natural scenery caused by oil and gas drilling. If Plaintiffs' challenge to the drilling permits is successful, the Center's staff and members will not have to suffer from increased air and water pollution that affects their ability to safely breathe, consume water, and recreate in this region, and they will be better able to participate in BLM's decision-making process.

The Wilderness Society

23.    Plaintiff The Wilderness Society ("TWS") is a nonprofit organization whose mission is to unite people to protect America's wild places. TWS is one of America's leading public lands conservation organizations. Since 1935, TWS has been dedicated to protecting America's wild places for current and future generations. TWS has offices throughout the country, including in Oakland, California. TWS has nearly 160,000 members and supporters nationwide, including about 20,000 members and supporters in California and over 200 members and supporters in Kern County. In addition to living in Kern County, TWS members and staff have visited and recreated on the public lands and natural resources in BLM's Bakersfield Field Office region in Kern County. TWS brings this action on its own behalf and on behalf of its adversely affected members.

24.    TWS's overall mission is to unite people to protect America's wild places. TWS contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations. TWS is committed to smart and sensible regulation and management of the nation's public lands, ensuring that these lands are part of the solution to climate change. Its primary strategic goals include transforming federal land management to prioritize climate mitigation and biodiversity protection and helping develop and advance policies for just and equitable public land and natural resource conservation on behalf of all people. A key metric for TWS is achieving net zero fossil fuel emissions on public lands by 2030 because of climate disruption and its deleterious impacts. In addition, TWS actively works to facilitate a just and equitable transition away from fossil fuels to a clean energy economy. All these priorities are important to its members and critical to its mission.

25.    To achieve its goals, TWS frequently engages in BLM land use planning and project proposals, including engagement with the drilling permits at issue. For over a decade,

TWS staff, consisting of experts in law, policy, and science, have prepared and submitted technical comments throughout multiple stages of BLM's oil and gas program activities, from resource management planning to leasing and drilling. TWS frequently comments on BLM's land use planning and comments on and protests many of the quarterly oil and gas lease sales across the West, including in the Bakersfield Field Office region. Thus, participating in BLM decision-making processes related to oil and gas development is one of TWS's core business activities.

26.    As a result of BLM's inadequate decision-making process and the approval of the drilling permits at issue, TWS members and affected communities in the area of these permits will experience worsened air and water quality and be less likely to safely live and recreate in the California southern Central Coast and Central Valley regions that TWS works to protect, undermining TWS's longstanding core work to end oil and gas development on public lands, eliminate the pollution it causes, and make public lands and natural resources part of the climate change solution. BLM's approval of these permits directly threatens these interests and TWS's core activities, including its work to achieve its goal of net zero fossil fuel emissions on federal public lands by 2030 and to protect the land, air, and water for all people and promote better health outcomes for generations to come. If Plaintiffs are successful in this lawsuit, TWS will be better able to participate in BLM's decision-making process and TWS staff and members will not experience the harmful effects of BLM's approval of the permits at issue.

Friends of the Earth

27.    Plaintiff Friends of the Earth ("FOE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. It has offices in Washington, D.C. and Oakland, California. FOE is a membership organization consisting of over 244,000 members and approximately 4 million activists nationwide, including more than 30,000 members who live in California and 9 members who live in the area managed by BLM's Bakersfield Field Office, including near Maricopa and Taft, California in the area of the drilling permits at issue. It is also a member of FOE International, which is a network of grassroots groups in 70 countries worldwide. FOE brings this action on its own behalf and on behalf of its adversely affected members.

28.    FOE's mission is to protect the natural environment, including air, water, and land,

1  and to achieve a healthier and more just world, using public education, advocacy, legislative

2  processes, and litigation. To do so, FOE works to protect the environment and society from the

3  adverse impacts of climate change and fossil fuel extraction, including harms to air quality,

4  climate, imperiled species, the health of local communities, and precious groundwater resources.

5  FOE's core business activities include fighting to reduce greenhouse gas emissions and domestic

6  reliance on fossil fuels, and to advance clean energy in and across the U.S., including in the

7  Bakersfield Field Office region. FOE's Public Lands campaign seeks to halt oil and gas

8  exploitation on public lands and put the U.S. on the path toward a just transition that protects

9  workers and communities and ends our dependence on fossil fuels. FOE's Fossil Fuels Program

10  actively engages in advocacy to curb new oil and gas leases on public lands and waters

11  throughout the country as well as influence policy and law governing fossil fuel development.

12      29.    FOE routinely submits formal letters protesting proposed BLM oil and gas lease

13  sales, comments extensively on BLM's drilling permits, and files litigation over unlawful BLM

14  decisions related to certain sales. It advocates to halt any new leasing and drilling of fossil fuels

15  on federal lands in the U.S.; lobbies members of Congress and other decisionmakers to urge them

16  to halt fossil fuel leasing, and speaks to the press, its members and activists, and the public about

17  its campaigns and the harm that fossil fuel extraction has on communities and the environment. It

18  also sends email alerts to its member and activist database, which it then posts on its website, to

19  inform the public of important updates on environmental issues related to its mission. In the last

20  few years alone, FOE sent at least nine membership emails related to oil and gas activity in

21  California, four of which specifically discussed drilling in BLM's Bakersfield Field Office area.

22  All told, FOE gathered 104,618 total petition signatures in response to these alerts opposing

23  additional drilling. It intends to continue doing this work in the future, including opposing oil and

24  gas development in and around the areas managed by BLM's Bakersfield Field Office.

25      30.    BLM's inadequate decision-making process and approval of the drilling permits at

26  issue harms FOE's mission and core activities aimed at halting oil and gas development on public

27  lands and protecting the environment and society from the adverse impacts of climate change and

28  fossil fuel extraction, including harms to air quality, climate, imperiled species, the health of local

communities, and precious groundwater resources. If Plaintiffs are successful in this lawsuit, FOE will be better able to participate in BLM's decision-making process and FOE staff and members will not experience the harmful effects of BLM's approval of the permits at issue.

31.    FOE has individual members who live, visit, work, or recreate in the Bakersfield Field Office region in Kern County. These members have specific intentions to continue to interact with these areas frequently and on an ongoing basis. These members' enjoyment of these activities is heavily dependent on the health, abundance, and protection of the surrounding environment. Communities in the Bakersfield Field Office area have suffered significantly degraded air quality due to high levels of ozone and particulate matter from activities like oil and gas drilling. More drilling in the area of the permits at issue will only worsen the already poor air quality in the region. Water quality is also a serious concern for these areas, as oil and gas activity poses greater risk for groundwater contamination due to spills, dumping, and leakage.

32.    FOE has individual members who live, study, work, or recreate on the lands and natural resources in the Bakersfield Field Office region in Kern County. These members are concerned about their health because of the impacts of drilling on the air and water in their community. Their quality of life and health are harmed by pollution from nearby drilling, and drilling the wells at issue in this case will exacerbate these harms. Some members often smell harmful pollutants in the air and need to wear face masks when they leave their homes and places of work. The poor air quality also inhibits members from taking outdoor walks for exercise and peace of mind. If the air was cleaner, they would be able to enjoy their communities.

33.    FOE members closely track local actions that affect their community but did not see notices or other news alerts about the drilling permits at issue or BLM's review process. FOE members frequently participate in comment letters and phone drives for decisions impacting the area and would have engaged in BLM's decision-making process for the permits if notified. If Plaintiffs' challenge to the drilling permits is successful, FOE members will not have to suffer from increased air pollution that affects their ability to safely breathe and recreate in this region, and they will be better able to participate in BLM's decision-making process.

1

<u>Sierra Club</u>

2      34.    Plaintiff Sierra Club is a national nonprofit organization with sixty-seven chapters

3 and more than 612,000 members dedicated to exploring, enjoying, and protecting the wild places

4 of the earth; to practicing and promoting the responsible use of the earth's ecosystems and

5 resources; to educating and enlisting humanity to protect and restore the quality of the natural and

6 human environment; and to using all lawful means to carry out these objectives. Sierra Club has

7 more than 132,000 members in California, and its Kern-Kaweah Chapter, which includes Kern

8 County, has over 1,120 members. The Sierra Club has been actively working in California,

9 including in Kern County, to address the serious threats to public health and the environment

10 posed by the lack of oversight and safeguards for oil and gas drilling activities. The Sierra Club

11 brings this action on its own behalf and on behalf of its adversely affected members.

12      35.    Sierra Club has a long history of grassroots activism, public education, lobbying,

13 and legal action that advocates for the transition away from fossil fuels to clean energy and for the

14 health and safety of communities. Sierra Club pursues these objectives nationwide, including in

15 California and the Bakersfield Field Office region, by working to protect communities and lands

16 administered by the federal government from the harmful impacts of oil and gas development,

17 including air and climate pollution.

18      36.    To fulfill its mission, one of the Sierra Club's core activities is to challenge BLM's

19 land use planning and oil and gas decision-making, including in the Bakersfield Field Office

20 region. For decades, Sierra Club and its members have engaged in activism, submitted public

21 comments, attended public meetings, promoted legislation, filed administrative protests with

22 BLM, and litigated numerous RMPs, oil and gas lease sales, and individual permits to drill. These

23 efforts include raising awareness about the public health consequences of oil and gas activities on

24 public lands in California, and challenges to BLM's RMPs and lease sales across the West in

25 Central California, New Mexico, Arizona, Utah, Colorado, and Alaska.

26      37.    BLM's inadequate decision-making process and approval of the drilling permits at

27 issue harms Sierra Club's mission and core activities aimed at transitioning the U.S. off fossil

28 fuels and protecting the environment and communities from the adverse impacts of climate

change and fossil fuel extraction, including harms to air quality, climate, imperiled species, the health of local communities, and precious groundwater resources. If Plaintiffs are successful in this lawsuit, Sierra Club will be better able to participate in BLM's decision-making process and its members will not experience the harmful effects of BLM's approval of the permits at issue.

38.     Sierra Club has staff and individual members who live, visit, work, or recreate in the Bakersfield Field Office region in Kern County. Each of these staff and members has specific intentions to continue to interact with these areas frequently and on an ongoing basis. These members' enjoyment of these activities is heavily dependent on the health and protection of the surrounding environment. Communities in the Bakersfield Field Office area have suffered significantly degraded air quality due to high levels of ozone and particulate matter from activities like oil and gas drilling. More drilling in the area of the permits at issue will only worsen the already serious air quality problems for the region.

39.     Sierra Club staff and members regularly hike, travel, and spend time with family and friends in and around the San Joaquin Valley. They are aware of the poor air quality in the region and receive frequent news alerts about bad air days when it is unsafe to go outside. The haze in the region impacts their ability to enjoy hikes and other recreation due to concerns about air pollution and the impacts of oil and gas drilling in the community. Staff and members would otherwise hike and bike more often and spend more time outdoors were it not for the poor air quality, and plan to continue to recreate in this area on an ongoing basis. If the wells at issue in this case are drilled, the pollution from these wells would directly impact them by worsening the already unhealthy air they breathe. Sierra Club staff and members did not see alerts or other notices about the drilling permits at issue in this case, despite having an interest and willingness to engage in BLM's decision-making process. If Plaintiffs' challenge to the drilling permits is successful, Sierra Club staff and members will not have to suffer from increased air pollution that affects their ability to safely breathe and recreate in this region, and they will be better able to participate in BLM's decision-making process.

Central California Asthma Collaborative

40.     Plaintiff Central California Asthma Collaborative ("CCAC") is a local nonprofit

1    organization with offices across the San Joaquin Valley, including in Bakersfield, Fresno, Visalia,

2    Modesto, and Delano, California. In 2024, CCAC expanded its service territory to also include

3    Sacramento, El Dorado, Amador, Alpine, Calaveras and Tuolumne counties. CCAC works

4    throughout Central California to reduce the burden of asthma and other respiratory conditions via

5    education, intervention, policy analysis, and advocacy by improving care and reducing air

6    pollution. CCAC serves more than 5,000 patients in the 13 counties it serves with its

7    Comprehensive Asthma Remediation and Education Services program, with more than 2,800

8    patients in Kern County. CCAC's Climate Equity and Environmental Justice division has also

9    partnered with community residents in advocacy efforts to ensure a just transition away from

10   fossil fuels and sensible, data-driven climate policies. CCAC's patients and staff live, work, and

11   recreate in and near the public lands and natural resources in BLM's Bakersfield Field Office

12   region covering Kern County and have longstanding recreational, professional, and aesthetic

13   interests in ensuring their continued use and enjoyment. CCAC brings this action on its own

14   behalf and on behalf of its adversely affected patients.

15       41.    Operating in the San Joaquin Valley for more than a decade, CCAC's mission is

16   to advance health equity and environmental justice by empowering Central California

17   communities through services, research, advocacy, and data-driven solutions to reduce the burden

18   of asthma. To achieve its mission, CCAC's core business activities include the development and

19   implementation of pollution and climate-related policies and programs that educate local residents

20   and directly mitigate health impacts among their patients, including from the widespread oil and

21   gas activity in the Valley.

22       42.    CCAC's programs in the Valley include an in-home asthma education and

23   remediation program for low income residents primarily from communities of color; a partnership

24   with health plans to receive direct patient referrals for high-risk asthmatic patients; a collaboration

25   with leading universities and research institutions to study the health effects of indoor and

26   outdoor air pollution; and a comprehensive field study to identify and mitigate methane emissions

27   in the southern San Joaquin Valley; among others. CCAC's programs are implemented broadly

28   across BLM's Bakersfield Field Office region, including in Kern, Kings, and Fresno counties.

43.     CCAC's staff has engaged in oil and gas issues in the San Joaquin Valley over the past decade, including challenging a BLM plan to open lands on or near national forests, parks and monuments, state, county and city parks, lakes, reservoirs, and rivers, along the Pacific Crest Trail, and on school campuses to drilling activity in collaboration with many environmental justice groups, and engaging on drilling permits. The additional oil and gas drilling authorized by the permits at issue in this case will worsen the already poor air quality and other environmental and public health problems in this region, and harm CCAC's interests in ensuring the continued use and enjoyment of the area for its staff and patients.

44.     CCAC's staff and patients are worried about the health impacts of additional drilling activity in Kern County because the air pollutants associated with oil and gas development are known to increase respiratory problems including asthma and other health ailments. Staff and patients have been negatively impacted by the region's poor air quality for many years and are concerned about activity that may further exacerbate pollution levels, including from the drilling permits challenged in this case. CCAC has staff and patients who experience health effects such as uncontrolled or exacerbated asthma symptoms.

45.      Enjoyment of the region's public lands by CCAC's staff and patients is harmed by poor air quality and disruptions to the natural scenery caused by drilling. If Plaintiffs' challenge to the permits is successful, CCAC's staff and patients will not have to suffer from increased air and water pollution that affects their ability to safely breathe, consume water, and recreate in this region, and they will be better able to participate in BLM's decision-making process.

<u>All Plaintiffs</u>

46.     Individual Plaintiffs and their boards, staff, members, and patients live, work, and recreate in and around the lands and natural resources at issue in this case. They will be adversely affected and irreparably harmed by BLM's issuance of the drilling permits. Plaintiffs' boards, staff, members, and patients intend to continue using and enjoying the lands and natural resources affected by the challenged drilling permits for recreation, scientific research, aesthetic and professional pursuits, and spiritual renewal frequently and on an ongoing basis in the future.

47.     Oil development pursuant to the drilling permits will degrade air quality, including

1    due to pollutants that travel large distances and worsen air quality in this part of the state.

2    Development will also pollute and consume precious water resources used and enjoyed by

3    Plaintiffs and their members and patients. In addition, oil development will harm Plaintiffs and

4    their members and patients by increased emission of pollutants responsible for climate change.

5    These harms will diminish their health and safety and ability to enjoy the recreational, spiritual,

6    professional, aesthetic, educational, and other activities in and around the lands near the

7    challenged drilling permits.

8        48.    Additionally, Plaintiffs and their respective boards, staff, members, and patients

9    have a substantial interest in ensuring that BLM complies with all applicable laws, including the

10   procedural requirements of the CAA, NEPA, FLPMA, MLA, and APA.

11       49.    Plaintiffs the Center, TWS, and Sierra Club participated extensively in BLM's

12   decision-making for the Bakersfield Field Office's most recent RMP and successfully challenged

13   the RMP in court. Plaintiffs the Center, TWS, Sierra Club, and FOE also participated extensively

14   in BLM's decision-making for the recent oil and gas lease sale held by the Bakersfield Field

15   Office in Kern County, and the Center, Sierra Club, and FOE successfully challenged the sale in

16   court. As a result of Plaintiffs' legal challenges, BLM agreed to pause any new oil or gas lease

17   sales in the Bakersfield Field Office region, and not issue permits on the leases issued in the most

18   recent sale, until it can redo its analysis under NEPA.

19       50.    All of the Plaintiffs have tracked and commented on BLM's drilling permits in the

20   Bakersfield Field Office region for many years, including the drilling permits at issue in this case.

21   Commenting on drilling permits requires significant time and resources from Plaintiffs' groups

22   because BLM offers limited to no public information or environmental analysis for permits in

23   advance of its approval decisions. BLM also does not provide alerts to notify the public about the

24   status of proposed permits and its permit databases are hard to access and navigate.

25       51.    Despite Plaintiffs' extensive comments on the drilling permits at issue, BLM

26   approved the permits without advance notice to any of the Plaintiffs or the broader public, and it

27   never posted its environmental documents for review beforehand. BLM's approvals, without

28   proper public review and input, harm Plaintiffs and their mission and longstanding work to

prevent impacts from oil and gas development on public lands and natural resources, including in the Bakersfield Field Office region. Plaintiffs have invested significant time and resources for years to ensure BLM complies with NEPA and other federal laws in its oil and gas management process, however, BLM continues to issue permits under a flawed permitting system.

52.    The limited data provided by BLM regarding drilling permits harms Plaintiffs' ability to participate effectively in the administrative process and evaluate the cumulative impacts of oil and gas drilling in the Bakersfield area. Additional drilling will further harm their recreational, scientific, professional, and aesthetic interests in the area. Accordingly, BLM's actions challenged here interfere with Plaintiffs' core business activities. If Plaintiffs are successful in this lawsuit, they will be better able to participate in BLM's decision-making process and their staff, members, and patients will not experience the harmful effects of BLM's approval of the permits at issue.

53.    Plaintiffs have thus exhausted their administrative remedies.

54.    The relief sought by Plaintiffs in this action—declaring BLM violated NEPA and other federal laws in approving the permits at issue, vacating the environmental documents supporting them, and stopping any drilling activity until BLM fully complies with federal laws—will remedy the injury to the Plaintiff organizations, their members and patients, local San Joaquin Valley communities and ecosystems, and the public impacted by BLM's decisions.

55.    Plaintiffs' injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

<u>Defendants</u>

56.    Defendant BLM is an administrative agency within the United States Department of the Interior, responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the U.S., including the land and mineral estate that is at issue in the challenged drilling permits, and in that capacity is responsible for implementing and complying with applicable laws and regulations.

57.    Defendant Douglas Burgum is sued in his official capacity as the Secretary of the United States Department of the Interior. As Secretary, Mr. Burgum is the official ultimately

responsible for managing federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

58.    Defendant Joseph Stout is sued in his official capacity as the State Director of BLM in California. As State Director, Mr. Stout is the official ultimately responsible for managing California's federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

59.    Defendant U.S. BUREAU OF LAND MANAGEMENT FIELD MANAGER is sued in their official capacity. The Field Manager is the official responsible for permitting oil drilling in the BLM Bakersfield planning area – approximately 1.2 million acres of federal mineral estate, covering eastern Fresno, western Kern, Kings, Madera, San Luis Obispo, Santa Barbara, Tulare, and Ventura counties. The Field Manager position for the BLM Bakersfield planning area is currently vacant.

60.    Defendant John Hodge is sued in his official capacity as the BLM Bakersfield Assistant Field Manager for Minerals. As Assistant Field Manager for Minerals, Mr. Hodge is the official responsible for reviewing staff recommendations on the proposed action, reviewing the environmental assessments for the drilling permits at issue, considering and rejecting alternatives, and ultimately approving the proposed actions.

61.    Defendant Holmes Western Oil Corporation ("Holmes") is the listed entity that requested and received twenty-five of the drilling permits at issue in this case in Kern County. Holmes is a California corporation authorized to do business in the state.

62.    Plaintiffs permissively join Defendant Holmes, pursuant to Federal Rule of Civil Procedure 20, because the relief requested by Plaintiffs is asserted against Holmes jointly with BLM, and Plaintiffs' right to relief arises out of the same transaction, i.e. the twenty-five drilling permits issued by BLM to Holmes. Fed. R. Civ. P. 20(a)(2)(A).

63.    Defendant Chevron USA Incorporated is the listed entity that requested and received four of the drilling permits at issue in this case in Kern County. As named, this entity is not registered to do business in California.

64.    Defendant Chevron U.S.A. Incorporated ("Chevron"), on information and belief, is doing business as Chevron USA Incorporated. Chevron is a Pennsylvania corporation authorized to do business in California and on information and belief is the corporation in receipt of the four drilling permits at issue.

65.    Plaintiffs permissively join Defendant Chevron dba Chevron USA Incorporated, pursuant to Federal Rule of Civil Procedure 20, because the relief requested by Plaintiffs is asserted against Chevron jointly with BLM, and Plaintiffs' right to relief arises out of the same transaction, i.e. the four drilling permits issued by BLM to Chevron. Fed. R. Civ. P. 20(a)(2)(A).

## STATUTORY BACKGROUND

### I. Clean Air Act

66.    The CAA establishes a comprehensive program for controlling and improving the nation's air quality through shared federal and state responsibility. The CAA authorizes the U.S. Environmental Protection Agency ("EPA") to establish National Ambient Air Quality Standards ("NAAQS") for pollutants deemed by EPA to be "criteria" pollutants. 42 U.S.C. §§ 7407–7410.

67.    States are required to submit a State Implementation Plan ("SIP") to EPA that regulates the states' fulfillment of the CAA and enforcement of the NAAQS. *Id*. § 7410(a)(1)–(2). EPA designates areas which fail to attain a NAAQS standard as "nonattainment" areas. *Id*. § 7407(d)(1).

68.    Section 176(c)(1) of the CAA provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." *Id*. § 7506(c)(1). Federal activities must not:

(i)    cause or contribute to any new violation of any standard in any area;

(ii)    increase the frequency or severity of any existing violation of any standard in any area; or

(iii)    delay timely attainment of any standard of any required interim emission reductions or other milestones in any area. *Id*.

69.    This is referred to as the "conformity" requirement (or the General Conformity Rule). A conformity determination is required for each criteria pollutant or precursor in a

1    nonattainment or maintenance area where the total emissions caused by a federal action would

2    equal or exceed the rates provided in the regulations. 40 C.F.R. § 93.153(b).

3        70.    Federal law prescribes a two-step process to conduct conformity review of federal

4    actions. First, an agency must determine whether its action will result in emissions exceeding a

5    certain threshold (or *de minimis* level). *Id*. Second, if the threshold requirement is met, the agency

6    must prepare a full "conformity determination" and mitigate the project's emissions so that the

7    project does not impair a region's ability to implement its plan for improving air quality. *Id*. §

8    93.152.

9        71.    To determine whether a project's emissions are *de minimis*, the federal agency

10    must show that total direct and indirect emissions, combined, are below the region's stipulated

11    thresholds. The project cannot be "piecemealed" or "segmented to create several smaller projects

12    with the emissions from each compared to the *de minimis* levels." EPA, General Conformity

13    Training Module 21 (2010), https://www.epa.gov/sites/default/files/2016-03/documents/general_

14    conformity_training_manual.pdf.

15        72.    Direct emissions are those that are caused by the action and indirect emissions are

16    those that may be separated by time or space but are of the type that "the agency can practically

17    control" and for which "the agency has continuing program responsibility." *Id*.

18        73.    All emissions must be "reasonably foreseeable," which means that they may be

19    calculated based on reasonable assumptions regarding techniques and equipment to be used. *Id*.

20    The portion of a project's emissions that must be permitted or are otherwise presumed to conform

21    may be excluded from the *de minimis* calculations. *Id*.; 40 C.F.R. § 93.153(d)(1).

22        74.    The CAA requires that any new major sources of air pollution in nonattainment

23    areas must obtain operating permits that include enforceable monitoring and reporting

24    requirements and controls for the lowest achievable emission rate to improve air quality. 42

25    U.S.C. §§ 7501–7515. For oil and gas sources, EPA has clarified that pollutant-emitting activities

26    located on one or more contiguous or adjacent properties, and that are under common control,

27    constitute a single source for permitting purposes. 40 C.F.R. § 51.165(a)(1)(ii)(B). Activities must

28    be considered "adjacent" if they are located on the same surface site, or if they are located on

1   surface sites that are located within a quarter mile of one another and share equipment. *Id.*

2           **II. National Environmental Policy Act**

3           75.     NEPA is "our basic national charter for protection of the environment." *Ctr. for*

4   *Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting *Blue*

5   *Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215–16 (9th Cir. 1998)). The

6   Fiscal Responsibility Act ("FRA") amended NEPA on June 3, 2023.

7           76.     NEPA's goals are to (1) "prevent or eliminate damage to the environment and

8   biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive

9   and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

10          77.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at

11  the environmental impacts of their actions before the actions occur, thereby ensuring "that the

12  agency, in reaching its decision, will have available, and will carefully consider, detailed

13  information concerning significant environmental impacts," and (2) "the relevant information will

14  be made available to the larger audience that may also play a role in both the decisionmaking

15  process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*,

16  490 U.S. 332, 349–50 (1989).

17          78.     A hard look includes evaluating the "cumulative effects" of the action, "which are

18  effects on the environment that result from the incremental effects of the action when added to the

19  effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1(i)(3).

20  "Cumulative effects can result from actions with individually minor but collectively significant

21  effects taking place over a period of time." *Id.* Agencies must provide quantified or detailed

22  information of how past, present, and future projects will combine with the proposed project to

23  impact the environment.

24          79.     "General statements about 'possible' effects and 'some risk' do not constitute a

25  'hard look' absent a justification regarding why more definitive information could not be

26  provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.

27  1998).

28          80.     NEPA requires federal agencies to prepare an environmental impact statement

("EIS") "with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). The U.S. Supreme Court has acknowledged that NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time," for example that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 (1976).

81.    To help determine whether an EIS is necessary, an agency may first prepare an environmental assessment ("EA"). 40 C.F.R. § 1501.5. If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact ("FONSI") detailing why the action "will not have a significant effect on the human environment." *Id*. § 1508.1(q); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See*, *e.g.*, *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

82.    In considering the scope of a proposed action, agencies must "evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action." 40 C.F.R. § 1501.3(b). Agencies cannot avoid a determination that an action will have significant environmental impacts by "segmenting an action into smaller component parts." *Id.* "This longstanding principle" prohibiting segmentation "is relevant not only when agencies are preparing EISs, but also when agencies determine whether to prepare an EA" and stretches back through decades of NEPA implementation. 89 Fed. Reg. 35,442, 35,462 (May 1, 2024) (citing *Fath v. Tex. Dep't of Transp.*, 924 F.3d 132, 137 (5th Cir. 2018) ("Agencies generally should not segment, or divide artificially a major Federal action into smaller components to escape the application of NEPA to some of its segments.") (quotations omitted)).

83.    Agencies also "shall consider whether there are connected actions, which are

1  closely related Federal activities or decisions that should be considered in the same NEPA review

2  that: (1) [a]utomatically trigger other actions that may require NEPA review; (2) [c]annot or will

3  not proceed unless other actions are taken previously or simultaneously; or (3) [a]re

4  interdependent parts of a larger action and depend on the larger action for their justification." 40

5  C.F.R. § 1501.3(b). This requirement seeks "to prevent an agency from dividing a project into

6  multiple actions, each of which individually has an insignificant environmental impact, but which

7  collectively have a substantial impact." *Great Basin Mine Watch v. Hankins¸* 456 F.3d 955, 969

8  (9th Cir. 2006) (internal quotations omitted) (in reference to a prior version of the NEPA

9  regulation requiring an agency to consider connected actions, as well as cumulative actions and

10  similar actions). When one project can reasonably be completed without the other, they are

11  considered to "have independent utility and are not 'connected' for NEPA's purposes." *Id.*

12      84.    Furthermore, "in considering whether an adverse effect of the proposed action is

13  significant, agencies shall examine both the context of the action and the intensity of the effect."

14  40 C.F.R. § 1501.3(d). In assessing the intensity of effects, agencies must consider, among other

15  factors, "[w]hether the action may violate relevant Federal, State, Tribal, or local laws or other

16  requirements or be inconsistent with Federal, State, Tribal, or local policies designed for the

17  protection of the environment." *Id.* § 1501.3(d)(2)(iii). Additional relevant factors include "[t]he

18  degree to which the action may adversely affect public health and safety," and "[t]he degree to

19  which the action may adversely affect communities with environmental justice concerns." *Id.* §

20  1501.3(d)(2)(i), (vii).

21      85.    NEPA also requires an agency to prepare a detailed statement regarding the

22  alternatives to a proposed action. *See* 42 U.S.C. § 4332(C)(iii), (F). Consideration of reasonable

23  alternatives is necessary to ensure that the agency has taken into account all possible approaches

24  to, and potential environmental impacts of, a particular project.

25      86.    All environmental analyses required by NEPA must be conducted "at the earliest

26  reasonable time." 40 C.F.R. § 1501.2(a); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062,

27  1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental

28  consequence to the last possible moment. Rather, it is designed to require such analysis as soon as

1    it can reasonably be done.").

2        87.    Public participation is integral to NEPA to ensure that "the relevant information

3    will be made available to the larger audience that may also play a role in both the decisionmaking

4    process and the implementation of that decision." *Robertson*, 490 U.S. at 349. NEPA therefore

5    requires agencies to "[p]rovide public notification of NEPA-related hearings, public meetings,

6    and other opportunities for public engagement, and the availability of environmental documents

7    to inform those persons and agencies who may be interested or affected by their proposed

8    actions." 40 C.F.R. § 1501.9(c)(5). NEPA also requires the agency to "notify those entities and

9    persons who have requested notification on a particular action and those who have requested

10   regular notification from the agency on its actions." *Id.* § 1501.9(c)(5)(i). The Ninth Circuit has

11   recently held that NEPA requires BLM to provide public participation periods that are

12   "sufficiently long to permit members of the public to weigh in on the decision in an informed

13   manner" and "for participants to obtain and absorb the environmental information provided by the

14   agency and then prepare their own analyses and critiques, including consultation with experts

15   where appropriate." *Mont. Wildlife Fed'n v. Haaland*, No. CV-00069-BMM, 2025 WL 225388, at

16   *21–22 (9th Cir. Jan. 17, 2025) (concluding BLM violated NEPA "when it eliminated in some

17   instances and severely shortened in others the various public participation periods" for

18   environmental documents like its EAs for certain oil and gas lease sales in the Western U.S.).

19       **III. Federal Land Policy and Management Act**

20       88.    FLPMA governs the management, protection, development, and enhancement of

21   federal property under BLM's jurisdiction.

22       89.    Under FLPMA, BLM, in its decisions about whether and how to approve new

23   permits to drill for oil, must: (1) protect public land values, including air and atmospheric values,

24   43 U.S.C. § 1701(a)(8); (2) account for "the long-term needs of future generations," *id*. § 1702(c);

25   (3) prevent "permanent impairment of the productivity of the land and quality of the

26   environment," *id*. § 1702(c); and (4) "take any action necessary to prevent unnecessary or undue

27   degradation of the lands," *id*. § 1732(b).

28       90.    FLPMA also requires BLM to comply with all applicable air quality standards,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    24

1 including those found in the CAA, as described above, in land use planning and when authorizing

2 activities. *Id*. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

3          91.      Like NEPA, FLPMA requires public participation. Section 309(e) of FLPMA

4 requires BLM to "give . . . the public adequate notice and an opportunity to comment upon . . .

5 and to participate in . . . the management of[] the public lands." 43 U.S.C. § 1739(e). FLPMA

6 also specifically requires BLM "to provide opportunities for public participation . . . for down-

7 the-line decisions" like whether to issue individual drilling permits. *Mont. Wildlife Fed'n*, 2025

8 WL 225388, at *22. "That requirement applies even when dispensing with or constricting such

9 participation would be more efficient." *Id.* at *23.

10          **IV. The Mineral Leasing Act**

11          92.      Under the MLA, the Secretary of the Interior is responsible for managing and

12 overseeing mineral development on public lands, not only to ensure safe and fair development of

13 the mineral resource, but also to "safeguard[] . . . the public welfare." 30 U.S.C. § 187.

14          93.      The MLA also requires public participation in drilling permits, specifying that

15 BLM must provide the public the "terms" of a drilling permit, as well as "maps or a narrative

16 description of the affected lands," at least 30 days before issuing the permit. *Id*. § 226(f). Such

17 maps must "show the location of all tracts to be leased, and of all leases already issued in the

18 general area." *Id*.

19          **V. Administrative Procedure Act**

20          94.      The APA provides a right to judicial review for any "person suffering legal wrong

21 because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include

22 final agency actions "for which there is no other adequate remedy in a court." *Id*. § 704.

23          95.      Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside

24 agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

25 accordance with law." *Id*. § 706(2)(A). Agency actions may also be set aside in other

26 circumstances, such as where the action is "without observance of procedure required by law." *Id*.

27 § 706(2)(B)–(F).

28

1

**FACTUAL BACKGROUND**

2

**I. The San Joaquin Valley and the Environmental Impacts of Oil Drilling**

3        96.    The San Joaquin Valley air basin is home to our nation's greatest air quality

4   challenges. The Valley maintains the worst designation for ozone pollution in the country.

5        97.    Ozone is a colorless, odorless reactive gas comprised of three oxygen atoms. It is

6   formed by the chemical reaction between nitrogen oxides ("NOx") and volatile organic

7   compounds ("VOCs") in the presence of sunlight.

8        98.    The San Joaquin Valley's nonattainment designation means that the threshold for

9   what constitutes a "major source" of air pollution under the CAA is relatively low compared to

10  other parts of the country—only 10 tons per year each of the ozone precursors NOx and VOCs.

11       99.    In fact, BLM notes that Kern County exceeds safe thresholds for ozone and

12  particulate matter on nearly one-third of all days in the year and that such poor air quality presents

13  health risks to residents throughout the Valley. 2024 Holmes EA for Ten Applications at 12. The

14  American Lung Association found Kern County cities in the San Joaquin Valley to be among the

15  most polluted in the nation by year-round and daily particle pollution and ozone.

16       100.    Despite growing concerns over the lasting impacts that air pollution will have on

17  community members in the San Joaquin Valley, BLM continues to authorize drilling in the region

18  – the Valley continues to produce 75 percent of California's crude oil and maintain over 83

19  percent of the state's active wells, which cause significant air pollution.

20       101.    Several of the largest and most carbon-intensive oil fields in the country are also

21  located in the Valley, particularly Kern County. At every stage of oil extraction, pollutants are

22  released that exacerbate NAAQS violations in the Valley air basin, cause adverse health effects to

23  communities, and worsen the consequences of climate change.

24       102.    The process of oil extraction involves industrial procedures that emit significant

25  amounts of these pollutants that can travel for hundreds of miles and contribute to poor air quality

26  in the region overall. Indeed, these emissions have increased significantly over time in the air

27  basin in part due to oil and gas development.

28       103.    Specifically, in oil operations, NOx emissions arise from drilling, workovers, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    26

general use trucks. Emissions of VOCs are also highly impacted by oil extraction, and in fact the oil and natural gas industry is the largest source of industrial VOCs in the country.

104.    Pollution in the San Joaquin Valley air basin has worsened so much that NOx emissions are now visible from space—a development that can be largely attributed to an increase in oil and gas operations. By 2035, oil and gas production could be the largest source of NOx in Kern County, accounting for seventy percent of all emissions.

105.    One study estimates VOC emissions from oil and gas extraction in the San Joaquin Valley as akin to total transportation emissions in the region. This suggests that petroleum operations are responsible for significant amounts of criteria pollutants in the San Joaquin Valley.

106.    These emissions have real health impacts on people living in the San Joaquin Valley. According to the American Lung Association, "[i]f you live in Kern County, the air you breathe may put your health at risk." The EPA's National-Scale Air Toxics Assessment indicates that the respiratory hazard index, heart disease, and low life expectancy risk is significantly higher in Kern County than most of the country. A growing body of scientific research— including many rigorous, peer-reviewed studies in California—has also identified significant associations between proximity to oil and gas drilling and all manner of adverse health outcomes, including increased risk of pre-term births and high-risk pregnancies, asthma and other respiratory illnesses, depression and other adverse mental health outcomes, and cancer. The State of California's Oil and Gas Public Health Rulemaking Scientific Advisory Panel recently concluded "with a high level of certainty that concentrations of health-damaging air pollutants, including criteria air pollutants and toxic air contaminants, are more concentrated near [oil and gas development] activities compared to further away."

107.    These negative health impacts primarily fall on low-income people and minority populations in the Valley. In Kern County, nearly half the residents are low-income, and nearly 70 percent are minorities. Nearly 80 percent of the people living near wells in Kern County are people of color.

108.    The above-described air quality problems are expected to worsen over the years as the impacts of climate change aggravate dangerous weather patterns. The San Joaquin Valley is

1   expected to see more hot days, which will cause an increase in ground-level ozone formation.

2   Additionally, as air quality worsens with climate change, the community will be subjected to

3   worsening drought conditions.

4       109.    California, and Kern County in particular, also faces extreme water scarcity. Kern

5   County receives an average of less than six inches of rainfall per year, which means that surface

6   water supplies do not meet the needs of the region. Therefore, the County is forced to rely on a

7   complicated system of importing water and pumping/storing groundwater. Kern County has

8   already spent hundreds of millions of dollars to invest in a groundwater banking system that is

9   responsible for providing most of the County's potable water to its residents.

10      110.    The San Joaquin Valley also has the biggest imbalance between groundwater

11  pumping and replenishment in the state. As climate change and the accompanying droughts

12  continue to worsen, so will surface water scarcity and pressure on groundwater resources. This

13  trend is already visible, as groundwater overdraft in the Valley has accelerated in recent years.

14      111.    Kern County also experiences severe drinking water contamination problems.

15  Kern County has the second highest number of community water systems in California that rely

16  on contaminated groundwater. Residents in cities like Bakersfield are already forced to rely on

17  contaminated drinking water because the community water systems are small and lack the

18  resources to properly treat the groundwater or use another uncontaminated water source.

19      112.    Oil and gas production requires large volumes of water, and the Kern sub-basin is

20  already a critically overdrawn aquifer. The oil and gas industry's increasing demand for water

21  threatens the water sources for the small communities and domestic users in the San Joaquin

22  Valley that rely on local groundwater.

23      113.    Drilling also threatens to contaminate precious groundwater resources in the area

24  through the disposal and reinjection of produced water—waste fluid that is produced from a well

25  for the life of the well, and which must be separated and disposed.

26      114.    Injection of wastewater from wells into underground injection wells also poses a

27  threat. Oil operators in the San Joaquin Valley frequently dispose of waste fluids by using

28  underground injection wells. But oftentimes, those injection wells allow injection of waste fluids

directly into aquifers that may contain usable water, or into aquifers hydrologically connected to usable water, thereby contaminating the water supply.

115.    Climate change makes it even more important to protect potentially usable sources of groundwater. The warming climate is expected to increase demand for groundwater in coming years, putting greater pressure on current sources, and requiring water from previously untapped groundwater sources.

116.    Worse, oil and gas production and combustion dominate as significant sources of greenhouse gas emissions and are primary drivers of climate change. Continued drilling only creates a reinforcing loop of worsening air quality and water scarcity.

117.    These problems are all interrelated and cannot be assessed in a vacuum. As air and water quality deteriorates for community members in the Valley, so too will their ability to face continued risk of illness and drought.

**II. The Process of Oil and Gas Permitting on Public Land**

118.    Under the MLA and FLPMA, BLM manages oil and gas drilling on public lands using a three-stage process. In the first stage, BLM prepares, with public involvement, a Resource Management Plan for each unit of public land within its jurisdiction. 43 U.S.C. § 1712(a). An RMP operates like a zoning plan, defining the allowable uses of public lands within the plan area. At the RMP stage, BLM generally determines what areas to make available for oil and gas leasing and under what conditions. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n.1 (10th Cir. 2009) (describing process).

119.    An RMP does not require leasing any specific lands. BLM typically prepares an EIS evaluating, in general terms, the expected environmental impacts of its potential land management decisions, including oil and gas development.

120.    In the second stage, oil and gas operators submit an "expression of interest" to nominate specific sites within the plan area for oil and gas leasing. 43 C.F.R. § 3120.1-1(e). BLM then decides whether those lands are eligible and, if so, makes them available through a competitive leasing process, subject to the requirements of the RMP. 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3(a); 43 C.F.R. Part 3120.1 *et seq*. Prior to sale, BLM typically prepares an

1  environmental review evaluating the environmental impacts of the lease sale. BLM may also

2  subject leases to terms and conditions to protect the environment.

3      121.    In the third and final stage, which occurs after BLM holds the lease sale and issues

4  the leases, lessees submit applications for drilling permits to BLM. 43 C.F.R. § 3162.3-1(c). The

5  drilling permit stage represents a critical step in this process because it is the last and final step of

6  the federal permitting process before a permittee can begin ground disturbance.

7                          **PROCEDURAL BACKGROUND**

8      **I. Plaintiffs' Ongoing Challenge to BLM's Resource Management Plan and Lease**

9          **Sale**

10     122.    Plaintiffs' current challenge is not the first time a court has been asked to step in to

11  stop BLM from authorizing an expansion of oil and gas drilling on public lands in California

12  without accounting for air and water pollution, health, and climate impacts.

13     123.    Adopted in 2014, the Bakersfield RMP opened over 1 million acres of public land

14  and mineral estate in central California to leasing and drilling activity. In 2016, the Central

15  District of California concluded BLM failed to properly analyze the impacts of hydraulic

16  fracturing (or "fracking," a risky oil and gas stimulation technique whereby large volumes of fluid

17  are injected down a well under pressure great enough to fracture the surrounding rock formation)

18  authorized in the plan. *ForestWatch v. U.S. Bureau of Land Mgmt.*, No. CV-15-4378-MWF, 2016

19  WL 5172009, at *11–12 (C.D. Cal. Sept. 6, 2016). As a result of that litigation, BLM agreed to

20  complete supplemental NEPA analysis to address the deficiencies identified by the court.

21     124.    In April 2019, BLM released a draft supplemental environment impact statement

22  ("SEIS") for the Bakersfield RMP. In the Draft SEIS, BLM determined that estimated emissions

23  from the RMP fell below *de minimis* levels, and therefore did not necessitate performing a CAA

24  conformity review.

25     125.    In public comments on the Draft SEIS for the management plan, EPA pointed out

26  that "the emission estimates presented in the [Draft SEIS] are used to demonstrate that emissions

27  are below the *de minimis* levels for General Conformity. However, the necessary calculations are

28  not in the Draft SEIS and the format of the details of the emission calculations in Appendix E of

the [referenced 2015 Environmental Impact Report] do not allow for a full understanding of the emissions." The agency recommended that "BLM supplement the current information with those details to support the conclusion that a Conformity Determination is not required." EPA explained to BLM that to support a conformity determination, BLM must provide "detailed emissions calculations" including, among other factors, "a breakout of emissions calculated for individual equipment and area sources, as well as emissions estimates for transportation (e.g., number of truck trips for set-up, fracturing, take-down)" and an explanation of "emission factors and required horsepower (hp) for all equipment."

126.    In additional public comments on the Final SEIS, EPA noted BLM had failed to include the requested analysis, and that "EPA's concerns identified in our [Draft SEIS] comment letter remain." The agency went on to stress the need for a cumulative air impacts analysis of BLM's authorized oil and gas drilling for the region and requested the opportunity to confer with BLM at the drilling permits stage "to ensure that air quality analyses are adequate and address our [Draft SEIS] comments and to assist the BLM in ensuring that the requirements of General Conformity have been met."

127.    To date, BLM has never remedied these flaws, and the San Joaquin Valley still has no adequate CAA review of BLM's permitting decisions in the region overall, nor any mitigation plan for lessening the pollution impacts.

128.    Because the Final SEIS failed to respond to extensive public comments and still failed to confront the significant impacts of fracking on air quality, water, climate, and the health of nearby environmental justice communities, a diverse coalition of environmental justice, conservation, and business groups, including several of the Plaintiffs here, once again brought suit in the Central District. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 2:20-CV-00371 DSF (C.D. Cal., filed Jan. 14, 2020).

129.    In December 2020, before the Central District could resolve the ongoing challenge to BLM's inadequate NEPA review for its Bakersfield RMP, the agency barreled ahead with a lease sale in Kern County. This was the first lease sale in California in eight years, selling 4,133 acres of public land near Bakersfield. Because BLM's analysis of the sale's impacts relied on the

1    deficient analysis in the Final SEIS for the RMP, community groups and environmental

2    organizations, again including several of the Plaintiffs here, also challenged the lease sale in this

3    court. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 1:21-cv-00475-DAD-SAB

4    (E.D. Cal., filed March 22, 2021).

5        130.    BLM opened settlement discussions in both the challenge to the Final SEIS and

6    the challenge to the 2020 lease sale and, after a year and a half of negotiations, finalized

7    agreements with a variety of commitments from BLM, including: new supplemental analyses for

8    the Bakersfield RMP and 2020 lease sale, improved public participation requirements that include

9    Spanish translation and interpreters, and no new lease sales or permits to drill on the leases it

10    recently sold until the new analyses are complete. Pursuant to the settlement agreements, BLM

11    has gone back to the drawing board to redo its inadequate NEPA review for the Bakersfield area.

12    The agency is still studying the environmental impacts of the Bakersfield RMP and 2020 lease

13    sale and, as a result, there is currently no completed environmental review of the cumulative

14    impacts of BLM's oil and gas permitting decisions in the San Joaquin Valley.

15        131.    So as to provide meaningful input before BLM issues additional drilling permits,

16    both EPA and Plaintiffs requested that BLM provide its environmental review documents for any

17    additional drilling permits for public comment before approving them.

18        **II. Plaintiffs' Ongoing Challenge to BLM's Recent Approvals of Drilling Permits**

19        132.    In this vacuum of an adequate environmental review at previous stages of BLM's

20    oil and gas management in the region, the agency has nonetheless continued to issue permits to

21    companies to drill for oil.

22        133.    In June 2023, community and environmental groups, including most of the

23    Plaintiffs here, filed suit in this court challenging six drilling permits BLM approved in the San

24    Joaquin Valley, to ensure the agency takes a hard look at the impacts of the oil and gas activity it

25    is authorizing and considers reasonable alternatives before approving more permits. *Ctr. for*

26    *Biological Diversity, et al. v. U.S. Bureau of Land Mgmt., et al.*, No. CV-00938-JLT-CDB (E.D.

27    Cal., filed June 22, 2023) ("*Center for Biological Diversity I*"). BLM did not provide draft EAs or

28    even basic information about the proposed drilling activity prior to its approvals, did not inform

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                     32

the public of an opportunity to comment, and did not notify Plaintiffs or EPA of its decision to issue the permits.

134.    In November 2023, BLM moved this court in *Center for Biological Diversity I* for permission to "reexamine" its EA for the challenged permits. In May 2024, however, without waiting for the court to rule on its request, BLM issued a new EA and FONSI purporting to analyze the decision BLM made nearly a year prior to approve the permits.

135.    BLM's new EA for the permits disclosed a *12,730 percent increase* in its NOx emissions calculations for the six wells, yet it ultimately predicted that these emissions are still under the 10 tons per year threshold and therefore *de minimis*. These new calculations, however, (1) continued to employ an incorrect methodology for calculating emissions; (2) failed to provide any substantiation for the emissions assumptions; (3) omitted multiple categories of emissions; and (4) failed to provide any analysis of whether BLM's multiple connected and closely related permitting actions should be considered as one—in other words, whether they are unlawfully segmented from other activities BLM has permitted. Had BLM performed these calculations correctly and included all sources of emissions, the emissions would likely be over the 10 tons per year threshold and therefore significant. The agency also failed to analyze whether its permits in the Bakersfield plan area, along with other drilling permits issued at the local level by Kern County and the state level by California's Geologic Energy Management Division, have cumulatively significant impacts to public health and the environment, among other serious flaws.

136.    In May 2024—on the same day it issued the new EA for the six wells—BLM released an EA and FONSI for four more drilling permits in the Valley that relied on the same deficient analysis. The agency approved the permits just days later, again without notifying Plaintiffs or EPA of its decision to issue the permits.

137.    In July 2024, Plaintiffs amended their complaint in *Center for Biological Diversity I* to bring supplemental claims challenging BLM's new EA for the six permits and to challenge on the same grounds the nearly identical EA that BLM issued for the four additional permits.

138.    In August 2024, one of the oil company permittees filed a motion to dismiss Plaintiffs' first amended complaint, claiming Plaintiffs lacked standing to bring the case. In

1    response, Plaintiffs moved this court for permission to file a second amended complaint to add

2    extensive additional details regarding Plaintiffs' standing. Plaintiffs' motion is now pending.

3            **III. The Drilling Permits at Issue**

4          139.    Without waiting for the court to resolve Plaintiffs' ongoing challenge to BLM's

5    inadequate review of drilling permits, BLM has continued to unlawfully issue permits for oil

6    companies to drill new wells in the San Joaquin Valley without addressing the flaws in its system.

7          140.    On March 23, 2022, Chevron submitted applications for permits to drill four wells

8    in the Lost Hills oil field in Kern County, near the Valley community of Lost Hills. The proposed

9    activity would include the pre-construction clearing and grading of approximately 1.35 acres,

10    expansion of four existing well pads, installation of 500 feet of overhead power lines and 4,000

11    feet of pipelines, and drilling of four new wells.

12          141.    On October 17, 2022, Holmes submitted applications for permits to drill twenty-

13    one new oil wells in the Midway Sunset oil field in Kern County, near the Valley communities of

14    Maricopa and Taft. Two months later, in December 2022, Holmes added to its applications and

15    submitted applications for permits to drill an additional four oil wells in the same field. Together,

16    the proposed activity would include the construction of two new well pads, the clearing and

17    grading of three existing well pads and existing road access, the installation of associated power

18    poles and pipelines, and the drilling of twenty-five new wells.

19          142.    As with the previous drilling permits Plaintiffs challenged, BLM's notice of the

20    Holmes and Chevron permits provided almost no information on the proposed drilling activity,

21    including no information about the "terms" of the drilling or information on "all [oil and gas

22    leases] already issued in the general area." 30 U.S.C. § 226(f).

23          143.     The agency also did not provide draft EAs, inform the public of an opportunity to

24    comment, or provide notice for the applications to Plaintiffs or EPA.

25          144.    Again without the benefit of a formal public comment period and without seeing a

26    draft of the EAs, Plaintiffs in this case repeatedly submitted detailed comment letters on BLM's

27    proposed approval of the Holmes and Chevron drilling permits. On December 19, 2022, May 21,

28    2024, and August 7, 2024, Plaintiffs submitted detailed comments on the Holmes permits, and on

January 10, 2023 and May 21, 2024, Plaintiffs submitted detailed comments on the Chevron permits.

145.    With respect to air quality, Plaintiffs again explained that BLM has never undertaken a meaningful CAA conformity review for oil and gas development in the San Joaquin Valley. Plaintiffs reiterated EPA's comments explaining the need for detailed calculations to support BLM's conformity determination and the need to account for cumulative emissions. Plaintiffs also repeated that BLM is required under NEPA to evaluate cumulative air emissions.

146.    With respect to public health, Plaintiffs explained the growing scientific consensus that there is a causal relationship between close geographic proximity to oil and gas operations and adverse health outcomes. Plaintiffs again urged BLM to evaluate the cumulative impacts of adding more pollution from drilling into the pollution-burdened San Joaquin Valley. Plaintiffs further urged BLM to immediately implement setbacks of at least 3,200 feet from residential areas, in line with California's recent adoption of Senate Bill 1137 requiring the same minimum setback statewide to protect the health of nearby children, families, and vulnerable people.

147.    With respect to climate change, Plaintiffs explained that BLM must consider the cumulative climate change impacts from the drilling permits and to consider an alternative consistent with a managed decline of production rates and greenhouse gas pollution that will avoid catastrophic warming.

148.    With respect to water, Plaintiffs also explained again that BLM must analyze the cumulative water quality and scarcity impacts from the drilling permits.

149.    On December 18, 2024, without providing draft EAs for review to EPA or the public, BLM segmented the twenty-five Holmes permits into three smaller EAs of ten, eleven, and four wells each with no explanation for doing so. 2024 Holmes EA for Ten Applications; Environmental Assessment for Holmes Western Oil Corporation; Eleven Applications for Permit to Drill in Midway Sunset DOI-BLM-CA-C060-2024-0084-EA (hereinafter "2024 Holmes EA for Eleven Applications"); Environmental Assessment for Holmes Western Oil Corporation; Four Applications for Permit to Drill in Midway Sunset DOI-BLM-CA-C060-2024-0085-EA (hereinafter "2024 Holmes EA for Four Applications"). On the same day, BLM released separate

1  FONSIs and Decision Records approving each permit package. BLM again did not notify

2  Plaintiffs or EPA of its decision to issue the permits.

3       150.    With respect to air quality, BLM prepared a short table for each Holmes EA that

4  lists total air emissions estimates for ten wells, eleven wells, and four wells, respectively, in a

5  maximum year and average year, including for VOC and NOx across the well development and

6  production/operation stages. As with the previous drilling permits Plaintiffs challenged, BLM's

7  estimated maximum year emissions for each permit package are miniscule.

8       151.    For example, in the 2024 Holmes EA for Ten Applications, BLM calculates total

9  maximum year emissions for ten wells at 5.71 tons of VOC (or 0.571 tons per well) and 5.68 tons

10  of NOx (or 0.568 tons per well). In the 2024 Holmes EA for Eleven Applications, BLM

11  calculates total maximum year emissions for eleven wells at 6.28 tons of VOC (or 0.571 tons per

12  well) and 6.25 tons of NOx (or 0.568 tons per well). And in the 2024 Holmes EA for Four

13  Applications, BLM calculates total maximum year emissions for four wells at 2.28 tons of VOC

14  (or 0.57 tons per well) and 2.27 tons of NOx (or 0.568 tons per well). In each of these separate

15  EAs, BLM concludes that the emissions are below the *de minimis* thresholds of 10 tons each for

16  VOC and NOx and concludes no formal conformity determination is required.

17       152.    On January 17, 2025, again without providing a draft EA for review to EPA or the

18  public, BLM released an EA and FONSI for the four drilling permits for Chevron in the Lost

19  Hills oil field. Environmental Assessment for Chevron USA Incorporated; Four Applications for

20  Permit to Drill in Lost Hills DOI-BLM-CA-C060-2024-0062-EA (hereinafter "2025 Chevron

21  EA"). It approved the permits on the same day. Again, BLM did not notify Plaintiffs or EPA of

22  its decision to issue the permits.

23       153.    With respect to air quality, BLM prepared the same short table in the 2025

24  Chevron EA that lists total air emissions estimates for the four wells in a maximum year and

25  average year across the well development and production/operation stages, including for VOC

26  and NOx. As with the other recently approved permits, BLM's estimated maximum year

27  emissions for VOC and NOx are miniscule.

28       154.    In the 2025 Chevron EA, BLM calculates total maximum year emissions for four

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF       36

1    wells at 0.26 tons of VOC (or 0.065 tons per well) and 0.82 tons of NOx (or 0.205 tons per well).

2    BLM again concludes that the emissions are below the *de minimis* thresholds of 10 tons each for

3    VOC and NOx and concludes no formal conformity determination is required.

4          155.    As with the previous drilling permits Plaintiffs challenged, however, BLM's

5    calculations for the new Holmes and Chevron permits (1) continue to employ an incorrect

6    methodology for calculating emissions; (2) fail to provide any substantiation for the emissions

7    assumptions; (3) omit multiple categories of emissions; and (4) fail to provide any analysis of

8    whether they are unlawfully segmented from other activities BLM has permitted, including to the

9    same operators on the same surface site or within a quarter mile, as EPA requires.

10          156.    For example, BLM did not justify its decision to permit the twenty-five wells to

11    Holmes by segmenting them in three smaller EAs, with only the emissions from each then

12    improperly compared to the *de minimis* levels—directly contradicting EPA's conformity

13    guidance. Despite BLM's concurrent decisions to approve these permits on the same day to the

14    same oil company in the same oil field, the 2024 Holmes EA for Ten Applications, 2024 Holmes

15    EA for Eleven Applications, and 2024 Holmes EA for Four Applications entirely fail to reference

16    or acknowledge each other. Had BLM calculated the maximum year VOC and NOx emissions for

17    all twenty-five wells in one EIS, the emissions would total 14.27 tons of VOC and 14.2 tons of

18    NOx—well over the 10 tons per year *de minimis* thresholds requiring a conformity determination.

19          157.    BLM further did not analyze whether the twenty-five Holmes wells and four

20    Chevron wells are segmented from one another or its other recent approvals in the Valley,

21    including the wells challenged in Plaintiffs' ongoing lawsuit in *Center for Biological Diversity I.*

22          158.    Each of the Holmes and Chevron EAs also still fail to undertake a cumulative

23    water scarcity analysis; do not explain how underground injection of wastewater may impact

24    drinking water; fail to quantify cumulative greenhouse gas emissions on a regional or national

25    scale; fail to evaluate the managed decline of fossil fuels on public lands in approving nearly

26    thirty drilling permits, or any other reasonable alternatives and mitigation strategies that would

27    limit climate impacts; and fail to analyze whether the reasonably foreseeable oil drilling permits

28

1    BLM plans to issue in the Bakersfield plan area, along with other drilling permits issued at the

2    local and state levels, have cumulatively significant impacts to public health and the environment.

3        159.    Furthermore, none of the Holmes EAs consider whether the drilling permits

4    violate or are inconsistent with state laws protecting the environment. Despite each of the EAs

5    acknowledging that the wells are located within close proximity to residents' homes in Maricopa,

6    BLM fails to consider or conclude that its permit approvals will therefore directly violate

7    California's Senate Bill 1137, which requires a 3,200-foot setback between drilling and sensitive

8    locations like homes. California enacted its setback law to expressly protect public health, the

9    environment, and communities like Maricopa with environmental justice concerns.

10       160.    Plaintiffs now file suit to ensure BLM takes a hard look at the impacts of the oil

11   and gas activity it is authorizing and considers reasonable alternatives, before approving

12   additional drilling permits.

13                             **FIRST CLAIM FOR RELIEF**

14                            **Violation of the Clean Air Act**

15       161.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

16   in the preceding paragraphs.

17       162.    BLM employed an incorrect methodology to calculate emissions before issuing

18   twenty-five drilling permits to Holmes in 2024 and four drilling permits to Chevron in 2025,

19   rendering its failure to aggregate drilling activity and perform conformity review on these permits

20   arbitrary and capricious and an abuse of discretion.

21       163.    The 2024 Holmes EA for Ten Applications, the 2024 Holmes EA for Eleven

22   Applications, the 2024 Holmes EA for Four Applications, and the 2025 Chevron EA all fail to

23   substantiate BLM's *de minimis* determinations because they (1) employ an incorrect methodology

24   for calculating emissions; (2) fail to provide any substantiation for the emissions assumptions; (3)

25   omit multiple categories of emissions; and (4) fail to provide any analysis of whether the permits

26   are unlawfully segmented from other drilling activities BLM has permitted.

27       164.    BLM's failure to aggregate drilling activity and conduct a conformity review for

28   the permits it issued to Holmes in 2024 and Chevron in 2025 violates the CAA. *See* 42 U.S.C. §§

1    7502(c), 7506(c)(1); 40 C.F.R. § 93.153(b); 43 U.S.C. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

2                                    **SECOND CLAIM FOR RELIEF**

3        **Violation of NEPA: Failure to Comply with Public Participation Requirements**

4        165.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

5    in the preceding paragraphs.

6        166.    NEPA's purpose is to ensure that an agency, "in reaching its decision, will have

7    available, and will carefully consider, detailed information concerning significant environmental

8    impacts; it also guarantees that the relevant information will be made available to the larger

9    audience that may also play a role in both the decision-making process and the implementation of

10   that decision." *Robertson*, 490 U.S. at 349. Thus, the Ninth Circuit has recently held that NEPA

11   requires BLM to provide public participation periods for its environmental documents that are

12   "sufficiently long to permit members of the public to weigh in on the decision in an informed

13   manner" and "for participants to obtain and absorb the environmental information provided by the

14   agency and then prepare their own analyses and critiques, including consultation with experts

15   where appropriate." *Mont. Wildlife Fed'n*, 2025 WL 225388, at *21–22.

16       167.    BLM's failure to give the public adequate information concerning environmental

17   impacts of the Holmes and Chevron drilling permits to allow the public to weigh in is contrary to

18   NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of

19   discretion, or otherwise not in accordance with law.

20                                    **THIRD CLAIM FOR RELIEF**

21       **Violation of NEPA: Failure to Take a Hard Look at Project Environmental Impacts**

22       168.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

23   in the preceding paragraphs.

24       169.    NEPA requires BLM to take a "hard look" at all reasonably foreseeable

25   environmental impacts and adverse effects of the proposed drilling permits, including direct

26   effects, indirect effects, and cumulative effects. *Robertson*, 490 U.S. at 349–50; 42 U.S.C. §

27   4332(2)(C); 40 C.F.R. § 1508.1.

28       170.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts of

the Holmes and Chevron drilling permits, including on:

   (a)    Air quality;

   (b)    Greenhouse gas emissions;

   (c)    Groundwater quantity and quality; and

   (d)    Human health and environmental justice communities.

171.    BLM's failure to disclose and adequately analyze the significant and adverse environmental impacts of its permit approvals is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**FOURTH CLAIM FOR RELIEF**

**Violation of NEPA: Failure to Consider Reasonable Alternatives**

172.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

173.    Pursuant to NEPA, BLM must consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14. BLM's duty to consider reasonable alternatives is operative even when impacts are not deemed significant. BLM must also consider reasonable alternatives "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H).

174.    By evaluating only the proposed action and a no action alternative, BLM failed to consider reasonable and viable alternatives to the approval of drilling permits for Holmes and Chevron, including alternatives such as a managed decline that would prevent or minimize the climate impacts of permit approvals.

175.    BLM's failure to identify and analyze reasonable and viable alternatives is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**FIFTH CLAIM FOR RELIEF**

**Violation of NEPA: Failure to Determine the Appropriate Level of NEPA Review**

176.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

1  in the preceding paragraphs.

2      177.    Pursuant to NEPA, BLM must prepare an EIS for "a proposed agency action . . .

3  that has a reasonably foreseeable significant effect on the quality of the human environment." 42

4  U.S.C. § 4336(b)(1). BLM cannot avoid a determination that an action will have significant

5  environmental impacts "by segmenting an action into smaller component parts." 40 C.F.R. §

6  1501.3(b). BLM must also "consider whether there are connected actions, which are closely

7  related Federal activities or decisions that should be considered in the same NEPA review." *Id*.

8  In assessing whether an action is significant, BLM must consider "[w]hether the action may

9  violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with

10  Federal, State, Tribal, or local policies designed for the protection of the environment." *Id.* §

11  1501.3(d)(2)(iii). The agency must also consider "[t]he degree to which the action may adversely

12  affect public health and safety," and "[t]he degree to which the action may adversely affect

13  communities with environmental justice concerns." *Id.* § 1501.3(d)(2)(i), (vii).

14      178.    By separating its consideration of the Holmes and Chevron permits across multiple

15  smaller EAs that fail to acknowledge each other, BLM failed to determine its permit approvals

16  have reasonably foreseeable significant impacts that should be analyzed in an EIS. BLM also

17  failed to consider that its permit approvals violate California's Senate Bill 1137 that prohibits

18  drilling within 3,200 feet of sensitive locations, despite acknowledging the close proximity of

19  local residents' homes to the approved wells.

20      179.    BLM's failure to determine the appropriate level of review is contrary to NEPA

21  and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or

22  otherwise not in accordance with law.

23                      **SIXTH CLAIM FOR RELIEF**

24                   **Violation of the Mineral Leasing Act**

25      180.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

26  in the preceding paragraphs.

27      181.    Under the MLA, BLM must provide the public with the "terms" of a drilling

28  permit as well as "maps or a narrative description of the affected lands," at least 30 days before

1    issuing the permit. This information must include information regarding "all [oil and gas] leases

2    already issued in the general area." 30 U.S.C. § 226(f).

3        182.    BLM's failure to provide the public with the "terms" of the Holmes and Chevron

4    drilling permits or "maps or a narrative description of the affected lands," including information

5    regarding "all [oil and gas] leases already issued in the general area" at least 30 days before

6    issuing the permits, violates the MLA.

7                            **SEVENTH CLAIM FOR RELIEF**

8            **Violation of the Federal Land Policy and Management Act**

9        183.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

10    in the preceding paragraphs.

11        184.    Section 309(e) of FLPMA requires BLM to "give . . . the public adequate notice

12    and an opportunity to comment upon . . . and to participate in . . . the management of[] the public

13    lands." 43 U.S.C. § 1739(e). The Ninth Circuit has further explained that FLPMA specifically

14    requires BLM "to provide opportunities for public participation . . . for down-the-line decisions"

15    like whether to issue drilling permits. *Mont. Wildlife Fed'n*, 2025 WL 225388, at *22.

16        185.    BLM's failure to give the public adequate notice and an opportunity to comment

17    upon and to participate in the management of the public lands by failing to provide the public

18    with adequate notice and opportunity to comment on the Holmes and Chevron drilling permits

19    violates FLPMA.

20                            **REQUEST FOR RELIEF**

21        WHEREFORE, Plaintiffs respectfully request that this Court:

22        (a)    Declare that Defendants violated the CAA, NEPA, FLPMA, MLA, and APA

23                in approving the drilling permits for Holmes and Chevron;

24        (b)    Vacate the EAs, Decision Records, and Findings of No Significant Impact for

25                these drilling permits;

26        (c)    Enjoin the drilling and pre-construction activities pursuant to these drilling

27                permits;

28        (d)    Retain continuing jurisdiction of this matter until Defendants fully remedy the

1                violations of law complained of herein;

2       (e)      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees

3                and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and

4                the Clean Air Act, 42 U.S.C. § 7604(d); and

5       (f)      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

Dated: February 4, 2025

MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2186 / Fax: (415) 217-2040

ELIZABETH B. FORSYTH
(CA Bar No. 288311)
eforsyth@earthjustice.org
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 531-0841 / Fax: (206) 343-1526

ANDRIA H. SO (CA Bar No. 341595)
aso@earthjustice.org
Earthjustice
707 Wilshire Boulevard, Suite 4300
Los Angeles, CA 90017
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Plaintiffs*