**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

Plaintiffs,

v.

U.S. BUREAU OF LAND MANAGEMENT, et al.,

Defendants.

Case No. 1:25-cv-00140 JLT CDB

ORDER GRANTING MOTIONS TO DISMISS, DENYING MOTION FOR SUMMARY JUDGMENT, AND DENYING MOTION FOR RECONSIDERATION

(Docs. 24, 25, 50, 57)

The plaintiffs in this case are several organizations that advocate in favor of protections for the natural environment, wildlife, and clean air and water. They allege that the U.S. Bureau of Land Management (BLM) wrongly granted several permits to drill new oil and gas wells on public land in California's Central Valley. (Doc. 1 at 3.) The defendants move to dismiss the case for lack of jurisdiction. They contend the complaint does not show that the organizations have standing to pursue their claims. For the reasons below, the motion is **GRANTED** with leave to amend. The organizations have not demonstrated that they have standing to assert claims in their own right or on behalf of their members. Because the Court lacks jurisdiction, it cannot hear the pending motion for summary judgment, and the motion for reconsideration of the magistrate judge's order is moot. Those motions are **DENIED**.

///

## ALLEGATIONS

There are twenty-five permits at issue: four issued to Chevron U.S.A. Inc. and twenty-one issued to Holmes Western Oil Corporation. (*See* Doc. 1 at 34.) Both companies are defendants in this case, along with the BLM. The plaintiffs are the Center for Biological Diversity, the Wilderness Society, the Friends of the Earth, the Sierra Club, and the Central California Asthma Collaborative. They argue the BLM issued the permits unlawfully in violation of the Clean Air Act, the National Environmental Policy Act, the Mineral Leasing Act, the Federal Land Policy and Management Act, and the Administrative Procedure Act. (*See id.* at 38–42.)

The plaintiffs filed this action to prevent the construction and operation of new wells. They allege that drilling and construction activities will exacerbate air and water pollution that is already dangerous and toxic. (*See id.* at 26–29.) The process of extracting oil from the ground, they say, releases chemicals like nitrogen oxides and volatile organic compounds that can travel hundreds of miles and react to form ozone. (*Id.* at 26–27.) These chemicals are now so thick in the air that they are visible from space, and according to one study, oil and gas extraction in the Valley releases about the same amount of volatile organic compounds as all of the cars and trucks in the entire region combined. (*See id.* at 27.) The plaintiffs also cite a "growing body of scientific research" tying oil and gas extraction to a variety of health problems—from pre-term births and asthma to depression and cancer—and they note that the risk of respiratory problems and heart disease are higher in Kern County than most of the country. (*Id.*) Finally, the plaintiffs also allege that oil and gas drilling depletes and pollutes the Valley's groundwater (*see id.* at 28–29) and that the combustion of oil and gas emits greenhouse gasses that can change the earth's climate (*id.* at 29).

The plaintiffs contend that the BLM wrongly considered Chevron's and Hughes's applications piecemeal, rather than weighing the cumulative effect of the many similar drilling operations that it has approved over the years. (*See, e.g.*, *id.* at 5, 37.) Projects like these, which might seem insignificant in isolation, can add up over time until, eventually, a haze fills in the air and the accumulated drill pads, pumpjacks, service roads, and pipelines cover the landscape. (*See* Doc. 24-1 at 6–7, 11.) According to the complaint, the BLM should have kept this whole picture

in view, but did not. (*See* Doc. 1 at 5.) The plaintiffs also allege that the BLM has run afoul of federal law by refusing or neglecting to give proper notice of its intentions, to solicit and consider comments from the public, and to prepare the environmental assessments and other similar reports that would reveal the harmful effects of the proposed drilling operations. (*See, e.g.*, *id.* at 34–35.)

The defendants portray the situation differently. They emphasize that the disputed permits are for projects on decades- or even century-old oil fields. By their telling, these are places where no one comes to study rare plants or wild animals, where no one admires the natural landscape, and where no one comes for recreation. (*See* Doc. 24-1 at 11–12.) And so, in the defendants' assessment, the effects of the twenty-five permits will be truly negligible in the grand scheme of things. (*See* Docs. 24-1 at 6–8; 25-1 at 14–15.) The BLM also cites data that, by its analysis, shows that air quality in the Valley is actually improving, not declining, and that cars and trucks are mostly to blame for local air quality problems, not oil and gas development projects. (*See id.* at 13–15.) The two companies argue similarly that oil and gas development accounts for less than one percent of all emissions in the Valley, much lower than other sources, such as wildfires and agriculture. (*See* Doc. 25-1 at 15.) Finally, all three defendants emphasize their belief that the plaintiffs had ample opportunities to express their views before the BLM made its decision. (*See* Docs. 24-1 at 8; 25-1 at 15–17.)

For now, however, the defendants do not contend that the plaintiffs' legal arguments will come up short. They argue instead that the case cannot move forward at all because the court lacks subject matter jurisdiction. (*See* Docs. 24, 25.) Their motions are fully briefed, and the court determined that oral arguments would not be necessary.

**STANDING**

The constitutional boundaries around a federal court's jurisdiction are indispensable limits on "the powers of an unelected, unrepresentative judiciary" within a democratic society. *Allen v. Wright*, 468 U.S. 737, 750 (1984) (citations and quotation marks omitted). Constitutional standing—the jurisdictional limit in question here—is often expressed in shorthand as a requirement that the complaining plaintiff have "a personal stake in the outcome of the

controversy." *Baker v. Carr*, 369 U.S. 186, 204 (1962). By imposing this restriction, federal courts ensure that they take up only the sorts of "cases" and "controversies" that they were established to hear, leaving other matters to the legislative and executive branches. *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992); *Flast*, 392 U.S. at 94–95.

The Supreme Court laid out three "elements" of standing in *Lujan*: (1) an "injury in fact" to the plaintiff that is not only both "concrete" and "particularized," but also "actual or imminent," (2) a "causal connection" between the defendant and that injury, and (3) the likelihood that a favorable decision will redress the injury. *Id.* at 560–61 (citations and quotation marks omitted). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Courts generally "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party." *Mecinas v. Hobbs*, 30 F.4th 890, 895–96 (9th Cir. 2022) (quoting *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000)).

The plaintiffs argue they have standing to pursue their claims both in their own right and on behalf of their individual members. The Court begins with their standing as organizations in their own right.

**I. Organizational Standing**

Organizations can "sue on their own behalf for injuries they have sustained." *All. Hippocratic Med.*, 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 279 n.19 (1982)). When they do, the "standing inquiry is the same." *Ariz. All. for Retired Americans v. Mayes*, 186 F.4th 622, 630 (9th Cir. 2026) (en banc). They "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. Hippocratic Med.*, 602 U.S. at 393–94).

Like an individual person, then, "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* at 394 (first quoting *Valley Forge Christian Col. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982), then quoting *Sierra Club v. Morton*, 405 U.S. 727, 739

(1972)). "When an organization's mission is frustrated just because it has a general objection to the challenged action, the organization has not suffered an injury-in-fact, even when it expends resources to voice that objection." *Ariz. All. Retired Am.*, 186 F.4th at 632. This means that "a diversion of resources may be evidence of an injury," but it is not necessarily "itself an injury-in-fact." *Id.* at 633 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)).

The Supreme Court held in *Alliance for Hippocratic Medicine*, for example, that several pro-life organizations could not challenge a set of FDA abortion drug regulations simply because those organizations had incurred costs in opposing those regulations, such as by conducting studies and drafting petitions. 602 U.S. at 394. If these types of injuries sufficed, then just about any organization could "spend its way to standing simply by expending money to gather information and advocate against the defendant's actions." *Id.* The costs that an organization incurs in response to a challenged policy can be an "injury in fact" when the policy interferes with the organization's "core business activities," not its advocacy. *Id.* at 395 (distinguishing *Havens Realty*, 455 U.S. 363).

The Ninth Circuit's en banc opinion in *Arizona Alliance for Retired Americans* offers another example of how this standard works. The plaintiffs were several organizations that worked to ensure that their members could register to vote and participate in elections. *See* 186 F. 4th at 629. They challenged an Arizona law that instructed county officials to cancel voter registrations if the recorder received "credible information" that a person had registered to vote in a different county and confirmed that the person had registered with that other county. *Id.* at 634. The organizations alleged that they had standing because they had spent time and money educating voters and the public about the effects of this provision, among other reasons. *See id.* at 635. This was not enough. The "mere diversion of resources to educate and train voters" on the law's potential effects could not "independently establish an injury-in-fact." *Id.* By contrast, a separate provision of the same state law made it a crime for anyone to "knowingly provide a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person." *Id.* (citation and alterations omitted). The plaintiffs did have standing to challenge this portion of the law. It subjected them to a

credible threat of prosecution based on their "core business," such as their work registering voters and helping them participate in elections. *See id.* at 636–40.

The organizations' allegations of injury in this case are similar to those that came up short in *Alliance for Hippocratic Medicine* and *Arizona Alliance for Retired Americans*:

**1. The Center for Biological Diversity** relies on its allegation that its "core business activities" include "engaging in BLM land use planning and project proposals." (Doc. 1 at 6.) "Its efforts include a longstanding California Oil and Gas campaign advocating for the protection of California species and natural resources against environmental damage from oil and gas drilling and government oversight of oil and gas activities." (*Id.*) It "prepares and distributes a wide array of educational and informational materials concerning threats to biodiversity and air and water quality, including public lands and natural resources" in this region. (*Id.*) It alleges that a successful challenge in this case will ensure it can continue to "participate in BLM's decision-making process." (*Id.* at 8.)

**2. The Wilderness Society** works "to unite people to protect America's wild places." (*Id.* at 8.) "Its primary strategic goals include transforming federal land management to prioritize climate mitigation and biodiversity protection and helping develop and advance policies for just and equitable public land and natural resource conservation on behalf of all people." (*Id.*) A "key metric" for its success is "achieving net zero fossil fuel emissions on public lands by 2030." (*Id.*) Like the Center for Biological Diversity, the Wilderness Society "engages in BLM land use planning and project proposals, including engagement with the drilling permits at issue" here. (*Id.*) Its staff "have prepared and submitted technical comments throughout multiple stages of BLM's oil and gas program activities, from resource management planning to leasing and drilling." (*Id.* at 8–9.) It alleges that "participating in BLM decision-making processes related to oil and gas development" is one of its "core business activities." (*Id.* at 9.) It contends that if it is "successful in this lawsuit," it "will be better able to participate" in that process. (*Id.*)

**3. Friends of the Earth** has a "mission to protect the natural environment, including air, water, and land, and to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation." (*Id.* at 9–10.) It "works to protect the environment and

society from the adverse impacts of climate change and fossil fuel extraction." (*Id.* at 10.) It describes is "core business activities" as "fighting to reduce greenhouse gas emissions and domestic reliance on fossil fuels" and advancing "clean energy in and across the U.S." (*Id.*) It "routinely submits formal letter protesting BLM oil and gas lease sales, comments extensively on BLM's drilling permits, and files litigation over unlawful BLM decisions." (*Id.*) It also "lobbies members of Congress" and "speaks to the press," to the public, and to its membership about "oil and gas activity." (*Id.*) If this lawsuit is successful, Friends of the Earth believes that it "will be better able to participate in BLM's decision-making process." (*Id.* at 11.)

**4. The Sierra Club** has a similar "history of grassroots activism, public education, lobbying, and legal action that advocates for the transition away from fossil fuels to clean energy and for the health and safety of communities." (*Id.* at 12.) (*Id.*) It describes its "core activities" as, among other things, challenging "BLM's land use planning and oil and gas decision-making." (*Id.*) It has "engaged in activism, submitted public comments, attended public meetings, promoted legislation, filed administrative protests with BLM, and litigated numerous [resource management plans], oil and gas lease sales, and individual permits to drill." (*Id.*) It alleges that the BLM's actions harm its "mission and core activities," which are "aimed at transitioning the U.S. off fossil fuels and protecting the environment and communities from the adverse impacts of climate change and fossil fuel extraction, including harms to air quality, climate, imperiled species, the health of local communities, and precious groundwater resources." (*Id.* at 12–13.) Like the other organizations, it alleges that if it is successful in this case, it "will be better able to participate in BLM's decision-making process." (*Id.* at 13.)

**5. The Central California Asthma Collaborative** advances "health equity and environmental justice." (*Id.* at 14.) It relies on "research" and "advocacy," among other tools, "to reduce the burden of asthma." (*Id.*) It describes its "core business" as "the development and implementation of pollution and climate-related policies and programs that educate local residents and directly mitigate health impacts among their patients, including from the widespread oil and gas activity in the Valley." (*Id.*) If this lawsuit is successful, it alleges that it "will be better able to participate in BLM's decision-making process." (*Id.* at 15.)

The advocacy organizations who were the plaintiffs in *Alliance for Hippocratic Medicine* relied on the same types of allegations and the same theory of standing. They contended that the FDA had impaired their "ability to provide services and achieve their organizational missions." Case Nos. 23-235, 23-236, Resp. Br. at 43 (Feb. 22, 2024). This included their efforts to "educate the public, their members, and their members' patients." *Id.* at 42–43. They argued that the FDA's actions had forced them to spend more time and more money analyzing the relevant data and research, which in turn prevented them from participating in the regulatory process that the FDA had created. *See id.* at 45. The Supreme Court rejected this argument. It held that it was not enough for them to prove that the FDA's actions had made it more difficult, more time-consuming, or more expensive to "gather information and advocate" against its actions. 602 U.S. at 394. That holding is decisive here.

The Supreme Court left open the possibility that an organization could show that it has standing in a case against a government agency by alleging (and ultimately proving) that the agency had not collected and disseminated certain information, provided that it was required to do so by federal law, citing *Federal Election Commission v. Akins*. *See id.* at 395–96 (citing 524 U.S. 11 (1998)). As the Ninth Circuit recently explained, this citation shows that there are "different paths for organizations to demonstrate standing." *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 676 (9th Cir. 2026). Under *Havens*, an organization can file a federal lawsuit based on allegations about harms to its "core business activities," but it cannot "spend its way to standing simply by expending money to gather information and advocate against the defendant's action." *Id.* (quoting *All. Hippocratic Med.*, 602 U.S. at 395). Under *Akins*, by contrast, organizations can "directly invoke their statutory rights to information." *Id.* (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016)).

The Supreme Court did not dwell on the "informational injury" theory of standing in *Alliance for Hippocratic Medicine* because the plaintiffs in that case had not claimed an informational injury; nor had they "suggested that federal law requires FDA to disseminate such information upon request by members of the public." 602 U.S. at 396. The complaint in this case, by contrast, might reasonably be characterized as asserting an "informational injury" in

violation of a federal statute. The organizations here allege, for example, that the BLM "provided almost no information on the proposed drilling activity," did not provide any draft environmental assessments, did not "inform the public of an opportunity to comment," and did not "provide notice" of its decision in violation of a variety of federal statutes. (*See* Doc. 1 at 25, 34, 36, 39, 42.)

Despite these allegations, the plaintiff organizations do not argue in opposition to the pending motions that they have standing based on an "informational injury," and they do not rely on cases like *Akins*. (*See* Doc. 35 at 20–22.) In the absence of an argument along these lines, the Court will not decide whether it has jurisdiction based on a theory of informational injury. It is the plaintiffs' burden, after all, as the parties "invoking federal jurisdiction," to show that this Court has jurisdiction, *Lujan*, 504 U.S. at 561, and it can be difficult to decide whether the types of disclosures in question here support a theory of informational standing, *compare, e.g.*, *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, 187 F.4th 616, 632–33 (D.C. Cir. 2026) (summarizing and applying the theory as interpreted in NEPA cases; finding the plaintiffs had standing), *with, e.g., id.* at 635–36 (Randolph, J., dissenting in part) (reaching the opposite conclusion). In these circumstances, the better course is to note the possibility that the organizations might ultimately show they have standing on their own behalf and permit an amendment, as the magistrate judge did in the related action. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 23-00938, 2025 WL 973980, at *8 (E.D. Cal. Apr. 1, 2025). For now, the plaintiff organizations have not demonstrated that they have standing to assert claims in their own right.

## II. Associational Standing

An organization can also show a federal court has jurisdiction to hear its claims if it has standing to assert those claims on behalf of its members. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009). "An association has standing on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members." *Satanic Temple v. Labrador*, 149 F.4th 1047,

1050 (9th Cir. 2025) (alterations omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs.* (*TOC*)*, Inc.*, 528 U.S. 167, 181 (2000)).

The plaintiffs cannot rely on this theory of standing because they have not satisfied the first of the three requirements: their complaint does not identify any members who would have standing to sue in their own right. That failure is fatal to their jurisdictional theory. *See id.* (collecting authority).

It is true, as the plaintiffs argue, that "an organization need not always 'identify by name the member of members injured.'" *Id.* (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)). But "that flexibility may be invoked only when it is 'relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendants' action." *Id.* (quoting *Nat'l Council of La Raza*, 800 F.3d at 1041).

The plaintiffs' allegations are simply too generic to meet that standard. They do not allege that any particular member has visited or plans to visit the places where the wells will be drilled. There may be reasons that an individual member might have standing, such as a health concern related to emissions, but the plaintiffs do not allege that any particular member has asthma or another health condition that will likely be exacerbated if new wells are drilled. Nor do the plaintiff organizations explain why it is likely that pollutants will travel to the places where any particular individual member lives or works, let alone that these pollutants will likely harm those members in a way that will make it possible to link the injury to the defendants.

The test for an "injury in fact" in a case like this one is not "reducible to inflexible, judicially mandated time or distance guidelines," and it cannot be applied in a "one-size-fits-all, mechanistic manner." *Ecological Rts.*, 230 F.3d at 1147, 1149. Courts often find themselves weighing quite specific and granular factors, like those highlighted in the previous paragraph. It is not unheard of for standing disputes to come down to evidence about where a particular person lives or works—even whether a person visited a particular stream when he was a boy and would like to fish or canoe in that stream once again. *See Laidlaw*, 528 U.S. at 704–05; *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000). The defendants cannot be expected to "understand and respond" to the organizations' claims of injury here without more

information about who is alleging that they were injured, why, and how. *Nat'l Council of La Raza*, 800 F.3d at 1041.

In short, the plaintiff organizations may very well have members who will likely suffer injuries in fact that would give them standing, but it is not possible to say that is true without resorting to speculation about their members. For that reason, the organizations have not demonstrated that they have standing to assert claims on behalf of those members. *See Satanic Temple*, 149 F.4th at 1051.

**CONCLUSION**

The motions to dismiss (Docs. 24, 25) are **GRANTED** with leave to amend. Any amended complaint must be filed within thirty days.

Because the plaintiffs have not demonstrated that the Court has jurisdiction to hear their claims, the pending motion for summary judgment (Doc. 50) is **DENIED** for lack of jurisdiction, and the related motion for reconsideration (Doc. 57) is **DENIED** as moot.

IT IS SO ORDERED.

Dated: October 27, 2026

UNITED STATES DISTRICT JUDGE